IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2025

IN RE ARLO L.[1]

**Appeal from the Chancery Court for Weakley County**
**No. 25,934          W. Michael Maloan, Chancellor**

_____

**No. W2025-00474-COA-R3-PT**

_____

This action involves the termination of a father's parental rights to his minor child. Following a bench trial, the court found that clear and convincing evidence existed to establish several statutory grounds of termination as applied to the father. The court also found that termination was in the child's best interest. We now affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY ARMSTRONG, J., joined.

Beau E. Pemberton, Dresden, Tennessee, for the appellant, Joshua L.

Jonathan Skrmetti, Attorney General & Reporter, and Allen T. Martin, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

I.          BACKGROUND

Arlo L. ("the Child") was born to Mary L. ("Mother") and Joshua L. ("Father") (collectively "Parents") in April 2020. The Child lived with Parents without incident until February 2023, when the Tennessee Department of Children's Services received a referral for drug exposure. The Parents submitted to drug testing. Mother's test was positive for THC, methamphetamine, benzodiazepine, and amphetamine. Father's test was positive for THC and amphetamine. In April 2023, DCS visited the home, where the case manager,

_____

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

Nicholas Boyd, observed a glass pipe, a lighter, and a pill bottle. Mother completed another drug screen, which was positive for amphetamines, methamphetamine, THC, and benzodiazepine. Father expressed issues with his mental health. Mr. Boyd offered assistance with securing services and transportation to such services.

On April 24, 2023, Mr. Boyd created a non-custodial permanency plan with the following requirements: (1) complete an alcohol and drug assessment; (2) submit to random drug screens; and (3) work with in-home service providers. Father was also specifically tasked with addressing his mental health concerns. The plan required the Parents to secure a hair follicle drug screen for the Child. The Parents denied knowledge of this plan, which was not signed by them and was created without their involvement. On May 23, 2023, the trial court directed the Parents to comply with the non-custodial plan. The Parents continued to refuse services and were non-compliant.

DCS removed the Child on June 7, 2023. The next day, the Child submitted to a hair follicle screening, which yielded a positive result for methamphetamine. The Parents' were also tested and likewise yielded a positive result for methamphetamine. Mother admitted past drug use, but she asserted that her current positive result was due to her use of the prescription medication, Wellbutrin. Father admitted to a relapse and admitted himself into a short-term relapse facility. The Parents later alleged that a man that was staying with them was at fault for the drug paraphernalia and the Child's positive result. The Child was adjudicated as dependent and neglected by admission on August 22, 2023. He was placed into a single-parent foster home, where he has remained since that time.

Upon his release, Father found employment and submitted some child support; however, he consistently failed drug screens. On July 12, 2024, DCS filed a petition to terminate Father's parental rights,[2] citing the following statutory grounds of termination: (1) abandonment for failure to provide a suitable home; (2) the persistence of conditions which led to removal; (3) severe child abuse; and (4) failure to manifest an ability and willingness to assume custody of the Child. A few months later, in October 2024, DCS suspended Father's visitations based upon his continued positive drug screen results.

The case proceeded to a hearing on the termination petition on January 25, 2025, at which Mr. Boyd testified that he was assigned to the case in January 2023 and made contact with the family in February 2023. The Parents alleged that another man living in the house had drugged them. Mr. Boyd recalled that the Parents and the Child were the only occupants at the house at the time of his visit but that there was evidence of another person's belongings. He asserted that he observed and photographed a glass pipe in the home during a visit in April 2023, well after the alleged third person had left the house.

---

[2]Mother's rights were also terminated. She has not appealed the termination of her parental rights and is not a party to this appeal.

Mr. Boyd admitted that the Parents did not participate in the initial child and family team meeting and that he crafted the initial permanency plan without their involvement because he could not find them. Despite this, he believed he could still work with the family. He stated that Father advised that he was struggling with his mental health. Mr. Boyd offered assistance with finding a provider and with transportation to his appointments but additional steps were never taken to secure these services. Mr. Boyd stated that Mother admitted past drug usage but denied any current use. She later refused services altogether, asserting that he had "triggered" a post-traumatic stress response. She did provide her prescription for Wellbutrin and an email from her doctor advising that Wellbutrin can sometimes yield a positive drug screen result for methamphetamine. Mr. Boyd contacted the doctor's office and was advised that any emails from the doctor would not be sent using the Yahoo! email address that was listed on the document he received from Mother.

Father testified that he was currently taking Adderall for his attention deficit hyperactivity disorder. He completed his mental health assessment and any other assessments he was asked to complete. He was also in a drug rehabilitation program at Journey Pure for more than a month following the Child's removal. He agreed that his drug screen results following his release from the program were usually positive for methamphetamine. He explained that he was taking Wellbutrin, which can yield a positive result for methamphetamine. However, he stated that he was no longer taking the medication because it had become too costly. When asked where he obtained illegal drugs, he stated that he "found them in the street." He later admitted that he lied because he thought the question was "ridiculous." He said that he obtained drugs from "a friend" but has not used drugs since his one-time relapse at the time of the Child's removal.

He stated that he and his wife live in an apartment in Clarksville and have been living there for approximately 3 to 4 months. He agreed that they had lived in several places prior to that but could not provide much information about the location or the length of their stay. He explained that Mother handled the logistics of their daily life. They did not provide DCS with every current address because he felt "threatened." When pressed as to why he felt threatened, Father stated that he had a right to feel the way he feels. He acknowledged that they lived in a homeless shelter for a short period of time. They left the shelter because it was a dangerous environment.

Father testified that he is employed at a restaurant. He works approximately 40 hours per week and receives a wage of $13.30 per hour. He believed that he had addressed the circumstances which led to removal and was in a much better place to care for the Child with a residence, steady employment, transportation, and sobriety. He continued,

> As far as my mental health goes, I have addressed what I needed to address with my mental health. I am pretty confident I can maintain stability, hold a job. I am in my right mind frame. I am healthy, happy. I just miss my son.

He admitted that he and his wife used methamphetamine together prior to the Child's birth; however, he denied ever seeing Mother use following the Child's birth. He professed that they were both clean and sober, with the exception of his one-time relapse at the time of the Child's removal.

Mother testified that she has two children, the Child and an older son who has since been adopted. She explained that she permitted the adoption of her son by his father to provide him with a better life; however, she has stayed in contact with him pursuant to their agreement. She detailed their residential living history for the court, providing various reasons for their continuous movement from place to place.

Josie Reyes, a DCS case manager, testified that she has served as the case manager since the Child's removal. She recalled that the Parents moved approximately seven times throughout her supervision of the case. She professed that she was not always provided with an address but that she did have their current address on file. She did not know that they had stayed in a homeless shelter until she received a call from the shelter advising her that the Parents were removed due to alleged drug use, a fact that the Parents vehemently denied throughout the hearing. She asserted that in additional to the constant movement, the Parents have failed to evidence a stable home free from drug use.

Ms. Reyes stated that the Parents did participate in the creation of a parenting plan following removal of the Child. She also explained the Criteria for Termination of Parental Rights; they signed the form, indicating their understanding. She recalled offering her assistance in securing suitable housing; however, the Parents indicated their intent to move out of state, limiting her ability to provide resources. She continued,

> [A]side from offering to provide resources for housing, [DCS requested participation] in in-home services to address drug and substance use, parenting skills, supervision, as well as mental health. We also provided transportation for both the parents and the child for visitation, court, or drug screens to be completed. Then we also discussed how [DCS] could assist with providing or requesting for mental health intakes and [alcohol and drug] assessments.

She asserted that the Parents did use some in-home services but did not utilize any additional services offered by DCS. She recalled that Father tested positive for methamphetamine shortly after he returned from the rehabilitation program. He has also continued to test positive for drugs throughout the custodial episode. She stated that his refusal to acknowledge his drug use has caused difficulty in providing services.

As to the Child, Ms. Reyes stated that he has resided in the same foster home since removal. He has adjusted well in the home. He now refers to his foster mother as "mom"

or "mother" and freely shows affection toward her. She professed that foster mother took great care of the Child and was willing to adopt him.[3]

Ms. Reyes agreed that the Child's visitation with the Parents generally "went well" but that their visitation was suspended as a result of their continued drug use out of concern for exposing the Child to methamphetamine through visitation. She further asserted that the Child evidenced behavior issues following visitation but that he has since stopped exhibiting such behaviors now that visitations have been suspended.

The deposition of David Engelhart, recorded on December 23, 2024, was entered into evidence without objection from the parties. Mr. Engelhart, the lab director and toxicologist at Omega Laboratories, was offered as an expert in the field of forensic toxicology without objection. Mr. Engelhart asserted that his laboratory conducts approximately 300,000 tests per year and that they have identified 6 false positives since 2005, setting their error rate at less than 0.0002 percent. Mr. Engelhart acknowledged that methamphetamine can be prescribed by a physician and that Benzphetamine, a prescription drug, metabolizes to methamphetamine. However, he asserted that the prescription drugs, Adderall and Wellbutrin, will not yield a positive result for methamphetamine in a hair follicle test conducted at his laboratory. Mr. Engelhart confirmed that specimens provided by Father on June 8, 2023; October 11, 2023; March 12, 2024; and June 21, 2024, all yielded a positive result in his laboratory for methamphetamine at varying levels above the cutoff rate. He professed that a one-time use or single dose of a drug would not be detected at the cutoff levels set by their laboratory. He explained that the cutoff levels are set, in part, to eliminate positive results due to incidental drug exposure.

Following the hearing, the court issued a final order in which it found that the evidence presented established the statutory grounds alleged. The court found that termination of Father's rights was in the best interest of the Child. This appeal followed.

## II. ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A. Whether clear and convincing evidence supports the court's finding of statutory grounds for termination.

B. Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Child.

---

[3] Foster mother confirmed her bond with the Child and her intent to adopt him.

### III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

In the event that the "resolution of an issue [] depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "[T]his court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV. DISCUSSION

### A.

As indicated above, the trial court granted the termination petition based upon the following statutory grounds: (1) abandonment by failure to provide a suitable home; (2) the persistence of conditions which led to removal; (3) severe child abuse; and (4) failure to manifest an ability and willingness to assume custody of the Child.[4]

---

[4] Father notes that sufficient evidence was not provided to sustain the ground of abandonment for failure to support as applied to him. This ground was not found by the trial court.

1.      Abandonment for failure to provide a suitable home

A parent may be found to have abandoned his or her child by failing to establish a suitable home.  Tenn. Code Ann. § 36-1-113(g)(1). This ground for the termination of parental rights is established when:

> (a)      The child has been removed from the home [] by a court order at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and the child was placed in [DCS custody];

> (b)      The juvenile court found [that DCS] made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

> (c)      For a period of four (4) months following the physical removal, [DCS] made reasonable efforts to assist the parent [] to establish a suitable home for the child, but that the parent [has] not made reciprocal reasonable efforts to provide a suitable home and [has] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.  The efforts of [DCS to assist the parent] in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent [] toward the same goal, when the parent [] is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(ii).  A "suitable home" means more than adequate "physical space" – it requires that the appropriate care and attention be given to the child as well.  *In re A.D.A.*, 84 S.W.3d at 599.  This court has determined that a suitable home is one that is free from drugs and domestic violence.  *Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007).

This ground requires DCS to make reasonable efforts to assist the parent.  Tenn. Code Ann. § 36-1-102(1)(A)(ii); *In re Kaliyah S.*, 455 S.W.3d 533, 553 n.29, 554 n.31, 555 n.32 (Tenn. 2015).  DCS's efforts to assist a parent "may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal." Tenn. Code Ann. § 36-1-102(1)(A)(ii).  "[P]arents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required DCS to remove their children from custody." *In re Shameel S.*, No. E2014-00294-COA-R3-PT, 2014 WL 4667571, at *5 (Tenn. Ct. App. Sep. 19, 2014) (quoting *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006) *overruled on other grounds* by *In re Kaliyah S.*, 455 S.W.3d at 555–56).

Here, the record reflects that Father continued to use drugs throughout the custodial episode and that the parents refused assistance from DCS in securing housing, advising DCS of their plan to move out of state. While the Parents remained in Tennessee, they moved from residence to residence. Father asserts that the suitability of his actual residence was not disproven by DCS. We agree—DCS was unable to track the Parents' constant movement throughout the case; however, this court has found that a suitable home must not only be stable in its condition but that the home itself must also be free from drug use. Despite the completion of a drug rehabilitation program, Father has continued to test positive for methamphetamine, with his last drug test yielding a positive result in June 2024, one month prior to the filing of the termination petition. Father continues to deny such drug use and asserts that his prescription medication was to blame for the positive results, an argument disproven by Mr. Engelhart. DCS asserted, and we agree, that its efforts were hindered by Father's failure to acknowledge his drug use. With these considerations in mind, we hold that there is clear and convincing evidence to support the trial court's termination of Father's parental rights on the ground of abandonment by failure to provide a suitable home.

2.      Persistence of conditions

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i)      The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

The record reflects that the conditions which led to removal in June 2023 were child safety concerns due to drug exposure. While Father completed a drug rehabilitation program, he continued to test positive for methamphetamine throughout the custodial episode. Following our review of the record, we conclude that there is little likelihood that the conditions which led to removal will be remedied at an early date when Father has failed to even acknowledge his constant drug use. The continuation of Father's relationship with the Child greatly diminishes his chances of early integration into a safe, stable, and permanent home. We affirm the trial court on this ground of termination.

### 3.    Severe child abuse

The trial court terminated Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(4), which provides:

> The parent or guardian has been found to have committed severe child abuse, as defined in [Section] 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against any child[.]

As relevant here, Tennessee Code Annotated section 37-1-102(27)(E) defines "severe child abuse" as:

> The ingestion of an illegal substance or a controlled substance by a child under eight (8) years of age that results in the child testing positive on a drug screen, except as legally prescribed to the child[.]

Here, the trial court hearing the petition to terminate parental rights found that the Child was exposed to methamphetamine while under Father's care, resulting in the Child testing positive for methamphetamine on a drug screen at the age of 3 years old. The record confirms the trial court's finding and the application of this ground of termination as applied to Father.

### 4.    Failure to manifest an ability and willingness to assume custody

Pursuant to Tennessee Code Annotated section 36-1-113(g)(14) parental rights may be terminated when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

- 10 -

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). First, a petitioner must prove that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *In re Neveah M.*, 614 S.W.3d at 674. Second, a petitioner must prove that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*

As to the first element, our Supreme Court has instructed as follows:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677 (citation omitted).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732 (footnotes omitted)).

Father did not evidence an ability or willingness to assume custody of the Child. As stated previously, Father has consistently tested positive for methamphetamine throughout the custodial episode, despite his attendance at a rehabilitation program. His failure to acknowledge his drug use and address the same renders him unable to assume custody of the Child and likewise evidences his unwillingness to assume custody. The record further supports a finding that placing the Child with him would pose a risk of substantial physical or psychological harm to his welfare given Father's use of illegal substances. With all of

- 11 -

these considerations in mind, we affirm the court's judgment terminating Father's parental rights on this ground.

B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must now consider whether termination of Father's parental rights was in the best interest of the Child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555. After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A)    The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)    Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)    Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

- 12 -

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2)     When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3)     All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4)     Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i).  "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).  The General Assembly has also stated that "when the best interest[ ] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).  We will group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case

because many of these factors touch on similar factual predicates and involve similar issues. *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We consider first the Child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect wellbeing), (D) (concerning the parent-child attachment), (E) (concerning visitation), (F) (concerning whether the Child is fearful of the parent), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's mental and emotional fitness and its corresponding impacts). With respect to these factors, the Child has lived with his foster mother since June 2023 in a stable environment without visitation from Father since October 2024. The evidence established that the Child exhibited behavior issues following visitation but no longer has these issues now that visitation has ceased. Foster mother has indicated her intent to adopt the Child, who is doing well in his current environment.

We turn next to the Child's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent's home triggers or exacerbate the children's experience of trauma or post-traumatic symptoms), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the children's needs), and (R) (involving the health and safety of the home). Father has failed to establish his ability to provide a suitable home free from drug use. He has consistently tested positive for methamphetamine throughout the custodial episode but denies his use of the drug.

Next, we consider Father's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the children's needs), (J) (involving the parent's lasting adjustment of circumstances), and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal). Father has not exhibited a sense of urgency in addressing the circumstances which led to removal and has not yet established a lasting adjustment of circumstances.

With regard to support and knowledge of the Child's needs, Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing the parent providing more than token support), (P) (addressing the parent's understanding of their needs), the record reflects that Father has remitted child support and has maintained employment that is likely sufficient to provide financially for the Child. However, the Child needs more than a physical home and income. He needs a home free from illegal drugs, which Father refuses to provide.

The trial court considered all the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination. Upon our review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record supports a determination that

termination of Father's parental rights was in the Child's best interest.

## V.    CONCLUSION

The judgment of the trial court is affirmed.  The case is remanded to the trial court for such further proceedings as may be necessary and consistent with this opinion.  Costs of the appeal are taxed to the appellant, Joshua L.

_____
JOHN W. McCLARTY, JUDGE